812 F.2d 1444
 CONSOLIDATED RAIL CORPORATION, Petitioner,
v.
The UNITED STATES of America and the Interstate Commerce
Commission, Respondents,
Carolina Power & Light Company, et al., Intervenors,
the Atchison, Topeka and Santa Fe Railway Company, et al.,
Intervenors.
The WESTERN COAL TRAFFIC LEAGUE, Petitioner,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
Carolina Power & Light Company, et al., Intervenors,
Virginia Electric and Power Company, et al., Intervenors.
ELECTRIC FUELS CORPORATION, Petitioner,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
the Atchison, Topeka and Santa Fe Railway Company, et al.,
Intervenors.
CHESSIE SYSTEM RAILROADS, et al., Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
the Atchison, Topeka and Santa Fe Railway Company, et al.,
Intervenors.
EDISON ELECTRIC INSTITUTE, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
the Atchison, Topeka and Santa Fe Railway Company, et al.,
Intervenors.
ALABAMA POWER COMPANY, et al., Petitioners,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
Central Illinois Light Company, et al., Intervenors.
WESTERN COAL TRAFFIC LEAGUE, Petitioner,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
Eastern and Southern Coal Hauling Railroads (Chessie System
Railroads, et al.), Atchison, Topeka and Santa Fe
Railway Company (Western Railroads),
Intervenors.
CAROLINA POWER & LIGHT COMPANY, Duke Power Co., Iowa Power &
Light Co., Iowa Public Service Co., the Kansas Power and
Light Co., Kerr-McGee Corp., Oklahoma Gas & Electric Co.,
Omaha Public Power Dist., S. Carolina Electric & Gas Co.,
Southwestern Electric Power Co., and Tampa Electric Co., Petitioners,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
Atchison, Topeka and Santa Fe Railway Co., et al., Intervenors.
CONSUMER OWNED POWER COALITION, Petitioner,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
Atchison, Topeka and Santa Fe Railway, et al., Intervenors.
WESTERN COAL TRAFFIC LEAGUE, Petitioner,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
Atchison, Topeka and Santa Fe Railway Company, et al., Intervenors.
NEVADA POWER COMPANY, Petitioner,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
Atchison, Topeka and Santa Fe Railway Company, et al., Intervenors.
VIRGINIA ELECTRIC AND POWER COMPANY, Petitioner,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
Atchison, et al. (Western Railroads), Intervenors.
EASTERN COAL TRANSPORTATION CONFERENCE, Petitioner,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
Atchison, et al. (Western Railroads), Intervenors.
ELECTRIC FUELS CORPORATION, Petitioner,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
Atchison, et al. (Western Railroads), Intervenors.
NERCO., INC., Potomac Electric Power Company, Public Service
Company of Indiana, Inc., South Carolina Public
Service Authority and System Fuels,
Inc., Petitioners,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
Atchison, et al. (Western Railroads), Intervenors.
CONSUMERS POWER COMPANY, Petitioner,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
Atchison, et al. (Western Railroads), National Industrial
Transportation League, Intervenors.
ATLANTIC CITY ELECTRIC COMPANY, Commonwealth Edison Co.,
Madison Gas & Electric Co., Monongahela Power Co.,
Pennsylvania Power & Light Co., the Cleveland Electric
Illuminating Co., Union Electric Co., Wisconsin Electric
Power Co., Wisconsin Public Service Corporation, Petitioners,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
Atchison, et al. (Western Railroads), Alabama Power Company,
et al., Intervenors.
EDISON ELECTRIC INSTITUTE, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Atchison, et al. (Western Railroads), Intervenors.
The DAYTON POWER AND LIGHT COMPANY, Petitioner,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
The Atchison, Topeka and Santa Fe Railway Company,
Burlington Northern Railroad Company; the Denver and Rio
Grande Western Railroad Company; Elgin, Joliet and Eastern
Railway Company; Green Bay and Western Railroad Company;
Illinois Terminal Railroad Company; Kansas City Southern
Railroad Company; the Milwaukee Road, Inc.;
Missouri-Kansas-Texas Railroad Company; Missouri Pacific
Railroad Company; Soo Line Railroad Company; Southern
Pacific Transportation Company; Union Pacific Railway
System; Chessie System Railroads; Consolidated Rail
Corporation; Norfolk & Western Railway Company; Seaboard
System Railroad, Inc. and Southern Railway System; Montana
Department of Commerce; Arizona Public Service Company and
Salt River Project Agricultural Improvement and Power
District, Intervenors.
 Nos. 81-3080, 81-3082, 82-3113, 82-3114, 82-3116, 82-3144,
82-3175, 83-3336, 83-3337 to 83-3341, 83-3343 to
83-3348, 83-3351, 85-3703 and 85-3704.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 14, 1986.
Decided Feb. 23, 1987.
 
 Robert S. Burk, General Counsel, Ellen D. Hanson, Associate General Counsel, Timm L. Abendroth (argued), Washington, D.C., for I.C.C.
 Douglas Ginsburg, Asst. Atty. Gen., John J. Powers, III, John P. Fonte, Attys., Dept. of Justice, Washington, D.C., for United States.
 R. Eden Martin (argued), Richard E. Young, David M. Levy (Robert B. Batchelder, Philip S. Brown, Samuel R. Freeman, Christopher A. Mills, William R. Power, Donal L. Turkal, Stuart E. Vaughn and Richard E. Weicher, of counsel), Sidley & Austin, Washington, D.C., for Western Railroads.
 Paul A. Cunningham (argued), Robert M. Jenkins, III, Merc D. Machlin (Richard B. Allen, Fred R. Birkholz, John A. Daily, James L. Howe, III, Richard W. Kienle, Charles C. Rettberg, Jr., James L. Tapley, Donald M. Tolmie and Anne E. Treadway, of counsel), Pepper, Hamilton & Scheetz, Washington, D.C., Laurence Z. Shiekman and Thomas E. Zemaitis, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for Eastern and Southern Railroads.
 John F. Donelan, John M. Cleary and Frederic L. Wood (argued), Donelan, Cleary, Wood & Maser, P.C., Washington, D.C., for Carolina Power and Light Co., Duke Power Co., South Carolina Elec. & Gas Co., Tampa Elec. Co., Kerr-McGee Coal Corp., Iowa-Illinois Gas and Elec. Co., Iowa Power & Light Co., Iowa Public Service Co., Iowa Southern Utilities Co., Oklahoma Gas & Elec. Co., Southwestern Elec. Power Co., Omaha Public Power Dist., and Iowa Elec. Light & Power Co.
 John M. Cutler, Jr. and Charles J. McCarthy, McCarthy, Sweeney & Harkaway, P.C., Washington, D.C., for Atlantic City Elec. Co., Commonwealth Edison Co., Madison Gas and Elec. Co., Monongahela Power Co., Pennsylvania Power & Light Co., Cleveland Elec. Illuminating Co., Union Elec. Co., Wisconsin Elec. Power Co., Wisconsin Power & Light Co. and Wisconsin Public Service Corp.
 James M. Casey (argued), Daniel John Regan, Jr., Reid & Priest, Washington, D.C., for Dayton Power and Light Co.
 John Guandolo and Vern W. Hill, MacDonald, McInerny, Guandolo, Jordan, & Crampton, Washington, D.C., and A.T. Udrys, Jackson, Mich., for Consumers Power Co.
 Harry H. Voight, Leonard M. Trosten and Michael F. McBride, Leboeuf, Lamb, Leiby & MacRae, Washington, D.C., for Edison Elec. Institute.
 J. Raymond Clark, Washington, D.C., for Central Illinois Light Co., Central Louisiana Elec. Co., NERCO, Inc., Potomac Elec. Power Co., Public Service Co. of Indiana, Inc., South Carolina Public Service Authority and System Fuels, Inc.
 William L. Slover, C. Michael Loftus, Donald G. Avery, John H. LeSeur and Kelvin J. Dowd, Slover & Loftus, Washington, D.C., for Western Coal Traffic League, Consumer Owned Power Coalition and Eastern Coal Transp. Conference.
 John R. Molm and Charles V. Gerkin, Jr., Troutman, Sanders, Lockerman & Ashmore, Atlanta, Ga., for Alabama Power Co., Georgia Power Co., Gulf Power Co., Mississippi Power Co. and Southern Co., Services, Inc.
 Dennis N. Barnes, Morgan, Lewis & Bockius, Washington, D.C., for Elec. Fuels Corp.
 Before GIBBONS, Chief Judge, BECKER, Circuit Judge, and VAN ARTSDALEN,* District Judge.
 OPINION OF THE COURT
 GIBBONS, Chief Judge:
 
 
 1
 This case is before us on petitions, pursuant to 28 U.S.C. Secs. 2321(a) and 2342(5) (1982 & Supp. III 1985), to enjoin or suspend an order of the Interstate Commerce Commission (ICC) issued on September 3, 1985 in Ex Parte No. 347 (Sub-No. 1), Coal Rate Guidelines, Nationwide, 1 I.C.C.2d 520 (1985). The proceeding in which the order was entered is part of the ICC's continuing effort to comply with the deregulation mandates of the Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. No. 94-210, 90 Stat. 31 (hereinafter 4 R Act) and the Staggers Rail Act of 1980, Pub.L. No. 96-448, 94 Stat. 1895 (hereinafter the Staggers Act). In Bessemer & Lake Erie R.R. v. I.C.C., 691 F.2d 1104 (3d Cir.1982), cert. denied, 462 U.S. 1110, 103 S.Ct. 2463, 77 L.Ed.2d 1340 (1983) this court upheld the ICC's rule adopting as the standard of revenue adequacy for market dominant carriers a rate of return on a net investment equal to the current cost of capital. The instant case involves an issue concerning the ICC's maximum rate guidelines for coal not presented in Bessemer--the extent to which the ICC may permit differential pricing for market dominant carriers who have not achieved revenue adequacy. The Final Guidelines embodied in Ex Parte No. 347 impose four constraints on market dominant carrier rates for captive coal shippers. We hold that the four constraints in the Final Guidelines are consistent with the 4 R Act and the Staggers Act. Thus we will affirm the ICC order insofar as it is challenged by various shipper interests.[1] Several carriers raise questions about the manner in which some of the constraints may be applied in individual rate cases.[2] We hold that their petitions present issues not ripe for judicial review.
 
 I.
 The Regulatory Scheme
 
 2
 In Bessemer this court described the regulatory scheme enacted by the 4 R Act and the Staggers Act. See 691 F.2d at 1107-09. For railroads subject to effective competition from other rail carriers or modes of transportation Congress opted to deregulate rates. While Congress preserved ICC ratemaking authority for market dominant carriers--those providing services to shippers who, by virtue of location and inability to use substitute products, are captive customers of a rail carrier--it mandated that the ICC develop standards for revenue adequacy of such carriers. In Bessemer we upheld the standard that the ICC adopted, but we were not proffered the standards that would be adopted in fixing the maximum rates chargeable by market dominant carriers. The 4 R Act authorizes adequate revenue "under honest, economical, and efficient management." 49 U.S.C.A. Sec. 10704(a)(2) (West Supp.1986). It would probably be inconsistent with that standard, and with traditional notions about fair ratemaking as well, to permit rates to captive shippers which subsidized inefficiency or dishonesty in carrier operations in the competitive sector. This point is explicitly made in the Long-Cannon Amendment to the Staggers Act, which provides:In determining whether a rate is reasonable, the Commission shall consider, among other factors, evidence of the following:
 
 
 3
 (i) the amount of traffic which is transported at revenues which do not contribute to going concern value and efforts made to minimize such traffic;
 
 
 4
 (ii) the amount of traffic which contributes only marginally to fixed costs and the extent to which, if any, rates on such traffic can be changed to maximize the revenues from such traffic; and
 
 
 5
 (iii) the carrier's mix of rail traffic to determine whether one commodity is paying an unreasonable share of the carrier's overall revenues.
 
 
 6
 Pub.L. No. 96-448, Sec. 203(a), 94 Stat. 1895, 1904 (1980) (codified at 49 U.S.C.A. Sec. 10707a(e)(2)(C) (West Supp.1986)).
 
 
 7
 Thus the ICC was directed to ensure reasonable rates charged to captive shippers and so, had to develop constraints on those rates which were nevertheless consistent with the basic requirement of revenue adequacy.
 
 II.
 The ICC Decision
 
 8
 Ex Parte 347 (Sub-No. 1) which we review is the ICC's response to these competing regulatory goals for transportation of coal by captive shippers. That response is the culmination of an effort to establish reasonable rates for coal movement by rail which commenced in May, 1978. See Ex Parte No. 347, Western Coal Investigations, 43 Fed.Reg. 22,151 (1978). After receiving comments from interested parties the ICC terminated the Western Coal Investigations and instituted a new subproceeding, which broadened the inquiry to cover all regions of the United States. See Ex Parte No. 347 (Sub-No. 1), Coal Rate Guidelines Nationwide, 45 Fed.Reg. 80,370 (1980) (1980 Notice).
 
 
 9
 After reviewing comments received in response to the 1980 Notice, the ICC filed a decision on December 21, 1981. See 46 Fed.Reg. 62,958 (1981 Notice). That decision finalized some issues, but invited further comment on others. Several petitions for review of the 1981 Notice were filed and consolidated in this court. (No. 81-3080). Because the ICC observed a material error in its 1981 Notice, it moved for a remand. This court granted the ICC's motion, but expressly retained jurisdiction over the proceedings.
 
 
 10
 On February 28, 1983 the ICC issued a proposal for a maximum rail rate policy for market dominant coal carriers and invited comment. See 48 Fed.Reg. 8,36 2 (1983) (1983 Notice). Several coal shippers filed petitions for review of the 1983 Notice in the United States Court of Appeals for the District of Columbia Circuit, which transferred those petitions to this court on July 18, 1983. On May 16, 1984 this court granted the ICC's motion to consolidate the petitions to review the 1981 and 1983 Notices, and to hold them in abeyance pending its final decision. This court also denied without prejudice several motions to dismiss all pending petitions for review.
 
 
 11
 Meanwhile the ICC undertook consideration of comments filed in response to the 1983 Notice. On September 3, 1985 the ICC issued its final decision in Ex parte No. 347 (Sub-No. 1) (Final Guidelines). The Final Guidelines adopt a pricing system called Constrained Market Pricing that is intended to assure that captive shippers will not be required to pay more than is necessary for the carrier to earn adequate revenues, or to pay more than is necessary for efficient service. While the Final Guidelines provide a framework for evaluating rate reasonableness, they do not purport to offer a ready rate formula for every coal movement. Four constraints are imposed on rail ratemaking for market dominant carriers.
 
 
 12
 The first constraint is railroad revenue adequacy. In Bessemer this court upheld the ICC standard for revenue adequacy--rate of return on net investment equal to the current cost of debt and equity capital. By imposing revenue adequacy as a ceiling, the ICC intends to insure that a captive shipper will "not be required to continue to pay differentially higher rates than other shippers when some or all of that differential is no longer necessary to ensure a financially sound carrier capable of meeting the current and future service needs." 1 I.C.C.2d 520, 535-36, slip op. at 18 (Aug. 8, 1985) (footnote omitted). In other words, when a carrier has achieved revenue adequacy, the rate charged to a captive shipper will be the same as that determined by competition for non-captive shippers.
 
 
 13
 The second constraint, management inefficiency, is designed to comply with the Long-Cannon requirements. See 49 U.S.C.A. Sec. 10707a(e)(2)(C) (West Supp.1986). Three types of inefficiencies are considered: (1) operating inefficiencies; (2) plant inefficiencies, i.e., whether all the assets in the railroad's investment base are necessary and fully productive; and (3) pricing inefficiencies, i.e., whether the carrier has terminated unprofitable traffic and is charging non-captive shippers as much as competition will allow.
 
 
 14
 The third constraint, stand-alone cost, calculates, hypothetically, the cost of serving a captive shipper or group of shippers alone. In order to insure that the captive shipper is not paying more than it would cost that shipper or a competitor of the railroad to provide service tailored to that shipper's need, a simulated competitive price standard is determined and compared with the actual rate charged. If a complaining shipper pays no more than the cost of providing service tailored to its need, it is benefiting from the economics resulting from shared facilities, whereas if it is paying more than that cost the shipper may be subsidizing service from which it derives no benefit.
 
 
 15
 The fourth and final restraint is phasing; that is, postponing in individual cases the immediate imposition of an otherwise justified rate increase if such an immediate increase would create economic disruption for the shipper. Instead the increase would be phased in over a period of time.
 
 
 16
 The Final Guidelines provide that the four constraints "may be used individually or in combination to analyze whether the rate [increase] is unreasonably high." 1 I.C.C.2d 520, 548, slip op. at 33 (Aug. 8, 1985). The ICC "will take whatever action is appropriate, based on the nature and extent of the violation shown, to afford relief to the complaining shipper and to promote proper pricing by the carrier." Id.
 
 III.
 Ripeness
 
 17
 Various petitioners and intervenors disagree on whether some or all of the questions posed by the Final Guidelines are ripe for judicial review. Some coal shipper petitioners urge that the entire ICC decision is unripe for review. Other petitioners and intervenors, focusing on specific issues dispute the ripeness of some issues, while urging that other issues should be reviewed at this time. In assessing which issues are now ripe for judicial consideration we must consider (1) the fitness of the issue for judicial resolution, and (2) the hardship to the parties if judicial review is withheld. An issue is fit for judicial review if it is essentially legal and if the agency's resolution of it is final. Abbott Laboratories v. Gardner, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967); Toilet Goods Ass'n v. Gardner, 387 U.S. 158, 162, 87 S.Ct. 1520, 1523, 18 L.Ed.2d 697 (1967).
 
 
 18
 Consumer Power Co. and Dayton Power & Light Co. urge that the Final Guidelines are in three respects inconsistent with the 4 R and Staggers Acts. That position raises essentially legal issues. Other coal shippers[3] urge, however, that these legal objections should not be considered at this time because the decision incorporating the Final Guidelines is merely a non-binding, general statement of policy, intended for further amplification in future rate proceedings. Thus it is argued that we should not review Ex Parte No. 347 (Sub-No. 1) at all at this time. In response the ICC contends that the Consumer Power and Dayton Power & Light challenges to the Final Guidelines should be reviewed now because the issues they raise are legal, and the ICC position on those issues is final. In support of its finality argument, the ICC points to the language in its decision:
 
 
 19
 The guidelines we are adopting here provide the proper analytical framework for evaluating the reasonableness of rates charged on market dominant coal movements.
 
 
 20
 1 I.C.C.2d 520, 524, slip op. at 5 (Aug. 8, 1985). Additionally, the ICC refers to its order that:
 
 
 21
 The Commission will be guided in individual coal rate reasonableness determinations by the principles of Constrained Market Pricing set forth in this decision.
 
 
 22
 1 I.C.C.2d 520, 552, slip op. at 34 (Aug. 8, 1985).
 
 
 23
 We agree that the ICC has clearly defined the new contours for maximum coal rate reasonableness analysis under the 4 R and Staggers Acts. Indications in the decision that the ICC is willing to remain open-minded to refinements, the need for which may become apparent in individual coal rate cases, do not detract from the decision to adopt Constrained Market Pricing as the method of analysis. Indeed it has already applied that method in one such individual case, which has been subjected to judicial review.[4]
 
 
 24
 Hardship to the parties, railroads, shippers, and the agency, from withholding judicial review at this stage is readily apparent. Constrained Market Pricing is now in place, and railroads must set and adjust their rates in conformance with the Final Guidelines. Shippers and railroads must be prepared to apply those guidelines in the large backlog of coal rate cases which, we are advised, is pending before the ICC.
 
 
 25
 Thus we reject the contention of those shippers who urge that the petitions to review the September 3, 1985 order in Ex Parte No. 347 (Sub-No. 1) should all be dismissed as unripe.
 
 
 26
 The Eastern and Southern Railroads,[5] while urging that the Final Guidelines are generally consistent with the 4 R and Staggers Acts, raise questions about how the guidelines will be applied in individual rate cases.
 
 
 27
 First, they contend that in fleshing out the managerial efficiency constraint the Commission erred in its adoption of a long-run marginal cost standard to measure revenue shortfall from the transportation of freight at rates below costs.[6] The objecting carriers appear to be concerned that the ICC will improperly apply the long-run managerial costs standard by using Rail Form A.[7] The ICC responds that while Rail Form A may be useful in individual cases as a rough indicator of costs, local factors may cause those costs to be greatly different. Thus, the ICC urges, it is not possible to tell at this stage how, if at all, Rail Form A will be used in individual rate cases.
 
 
 28
 The same railroads argue that the ICC has approved a method of determining stand-alone costs for purposes of that constraint which may allow first year stand-alone cost to fall below the full cost of capital applied to the investment. In response, the ICC urges that the challenge on this issue is premature for two reasons. First, the Final Guidelines contemplate no more than that in certain circumstances a railroad will not recover the full annual cost of capital in the first year. 1 I.C.C.2d 520, 545-46, slip op. at 31 (Aug. 8, 1985). Whether that model for stand-alone cost will be utilized in any specific case cannot now be firmly predicted. Second, as the objecting railroads concede, in some circumstances there might be a clear business justification for requiring a firm to accept an inadequate return on capital in the first year. What evidence might be presented for such a justification in an individual rate case is at this stage a matter of speculation.
 
 
 29
 We hold that the Eastern and Southern Railroads' objections to the Final Guidelines are not ripe for judicial review. No final agency action has been taken on these issues. No prejudice will occur to the carriers or to the other parties if consideration of their concerns is postponed until those issues arise in individual rate cases. Indeed the petitioning carriers virtually concede as much. See Reply Brief, Eastern and Southern Railroads at 3.
 
 
 30
 Consequently, having held that the captive coal shipper objections to the Final Guidelines are ripe for review, we now turn to the merits of their contentions.
 
 IV.
 The Merits
 
 31
 Prior to the 4 R and Staggers Acts ICC decisions on railroad rates were more or all less ad hoc. Railroad rate regulation was not like traditional public utility rate regulation because of the ICC's inability to guarantee that the carrier obtained business. The rates were initially established by the carriers, and when shippers contested them, various factors such as costs and value of service, rate comparisons, volume or density of traffic, and the level of competition were taken into account. See, e.g., Houston Lighting & Power Co. v. United States, 606 F.2d 1131, 1145 (D.C.Cir.1979), cert. denied, 444 U.S. 1073, 100 S.Ct. 1019, 62 L.Ed.2d 755 (1980). This approach permitted a large amount of differential pricing but the ICC gave very little consideration to a railroad's overall financial health. H.R.Rep. No. 1035, 96th Cong., 2d Sess. 87, reprinted in 1980 U.S. Code Cong. & Admin. News 3978, 4031.
 
 
 32
 The 4 R Act stripped the ICC of its railroad ratemaking jurisdiction over all but market dominant transportation. Because captive shippers can not readily resort to alternative transportation, the ICC is faced with circumstances similar to those facing public utility regulators. On the other hand, however, because only the captive shippers, not all customers of a railroad, are tied to a single source or service, it is unlike public utility regulation. The marketplace determines rates for all but captive shippers, and those rates vary with demand elasticity. The 4 R Act directed the ICC to establish "revenue levels adequate ... to cover total operating expenses, including depreciation and obsolescence, plus a fair, reasonable, and economic profit or return (or both) on capital employed in the business." Pub.L. No. 94-210, Sec. 205, 90 Stat. 31, 41 (1976). If the railroad's customers were, like those of an electric company, all captive, compliance with section 205 would be relatively simple. The task of complying with that section is complex, however, because the railroad's rates for its non-captive service are determined by market forces, while the non-captive service utilizes much of the same facilities. Therefore, the ICC had to develop some refined method of differential pricing.
 
 
 33
 Shortly after the enactment of the Staggers Act the ICC made its first attempt to establish a methodology for determining maximum reasonable coal rates. It proposed to modify the formula for calculating fully allocated cost by using a "ton/ton-mile method" that would allocate common costs according to the weight of shipment and the length of haul. By relying on allocated costs for ratemaking, the ICC hoped to achieve a sufficient degree of differential pricing between captive shippers and others, thereby satisfying the goals of the 4 R and Staggers Acts. See Ex Parte No. 347 (Sub-No. 1), Coal Rate Guidelines Nationwide, 45 Fed.Reg. 80,370 (1980).
 
 
 34
 After receiving comments on the "ton/ton-mile method", however, the ICC concluded that the proposal would not achieve the desired result because "the market effectively ignores the 'scientific' assignment of certain costs to each of the carrier's rates." Ex Parte No. 347 (Sub-No. 1), Coal Rate Guidelines Nationwide, slip op. at 8 (Feb. 8, 1983) (footnote omitted). In other words, if non-captive shippers were required to pay fully allocated costs, they would divert traffic to competing carriers and would leave the remaining shippers subject to higher shares of common costs. Among the non-captive shippers, demand is highly elastic and any change in price will result in a substantial change in service demanded, whereas the captive shippers' demand is inelastic--service demand is unresponsive to price changes. A cost allocation method of pricing ignored shipper demand.
 
 
 35
 Consequently, in an unpublished decision issued February 24, 1983 the ICC proposed the Constrained Market Pricing method which was refined and adopted in the order we review. Id. The object of this method is to apportion all unattributable (common) costs of a railroad among its services in inverse relation to the elasticity of shipper demand for such services. The conceptual underpinning for this pricing method is "Ramsey pricing,"[8] which defines in mathematical terms the most efficient or optimum price for every service provided. As explained by the ICC:
 
 
 36
 Under Ramsey pricing, each price or rate contains a mark-up above the long-run marginal cost of the product or service to cover a portion of the unattributable costs. The unattributable costs are allocated among the purchasers or users in inverse relation to their demand elasticity. Thus, in a market where shippers are very sensitive to price changes (a highly elastic market), the mark-up would be smaller than in a market where shippers are less price sensitive. The sum of the mark-ups [is set at a level which] equals the unattributable costs of an efficient producer.
 
 
 37
 1 I.C.C.2d 520, 526-27, slip op. at 8 (Aug. 8, 1985) (emphasis added). Because pure Ramsey pricing is based on a complex mathematical formula requiring the exact quantification of marginal cost and demand elasticity in a carrier's system, the ICC concluded that it was not feasible. 1 I.C.C.2d 520, 526-28, 532-33, slip op. at 7-9, 14-16 (Aug. 8, 1985). Instead the ICC opted to rely primarily on market forces, whereby services may be priced above their attributable costs according to observable market demand, but only to the extent necessary to cover total costs, including return on investment of an efficient carrier. 1 I.C.C.2d 520, 533-34, slip op. at 16-17 (Aug. 8, 1985). Thus the ICC would permit carriers to charge captive shippers a higher share of unattributable costs than shippers in the competitive market share, subject to four constraints designed to protect the captive shippers from paying rates that are unnecessary to achieve revenue adequacy and which reflect inefficiencies.[9]
 
 
 38
 Some shippers contend that the ICC's management efficiency constraint is illusory because a shipper attempting to rely upon it in an individual rate case will have the burden of proof and will be faced with difficulties in meeting that burden. The allocation of burden of proof, however, is controlled by Section 10701 of the Interstate Commerce Act, 49 U.S.C.A. Sec. 10701a(b)(2)(A) (West Supp.1986), which imposes on shippers the burden of proof in all cases relating to the reasonableness of a rate. Further, in meeting that burden the shipper has access to data in the exclusive possession of carriers through ICC discovery procedures. See 49 C.F.R. Sec. 1114.21 et seq. (1985). The ICC requires a shipper to state in a discovery request the substance of the charges it seeks to prove, but that threshold requirement is consistent with the governing statutes and with due process. Thus we find no procedural defects in the evidentiary requirements imposed by the Final Guidelines' management efficiency constraint.
 
 
 39
 Some shippers urge that the Final Guidelines are inconsistent with the 4 R and Staggers Acts mandates to protect captive shippers from unreasonable rates, in that they give too much weight to the achievement of revenue adequacy and too little to the interests of shippers. They argue that because no carrier has to date achieved revenue adequacy, the ICC's first restraint is illusory. In essence this line of argument disputes the soundness of the measure of revenue adequacy (a rate of return on net investment equal to the current cost of debt and equity capital) which this court approved in Bessemer & Lake Erie R.R. v. I.C.C., 691 F.2d 1104 (3d Cir.1982), cert. denied, 462 U.S. 1110, 103 S.Ct. 2463, 77 L.Ed.2d 1340 (1983). For the reasons set forth in Bessemer, we are convinced that the ICC's basic approach on revenue adequacy is consistent with the 4 R and Staggers Acts. Even if we were not, we are not free to entertain in this proceeding a collateral attack on the Bessemer holding.
 
 
 40
 Some shippers object that, as formulated, the ICC's management efficiency constraint denies adequate relief to a shipper who demonstrates significant railroad inefficiencies that do not represent the railroad's unavailable revenue need shortfall. As devised by the ICC, the management efficiency constraint requires that management inefficiencies be shown on a system-wide basis, and be proved to be so great that the carrier would achieve revenue adequacy for the entire system if the inefficiencies were eliminated. The objecting shippers contend that if in an individual rate case they prove any management inefficiencies they should receive a dollar rate reduction for each dollar of proven management inefficiency. The ICC's rejection of their "bounty" approach is said to be arbitrary, capricious, and an abuse of discretion. It is clear, however, that in rejecting this "bounty" approach the ICC made a reasoned analysis of its inutility:
 
 
 41
 It should be readily apparent from this discussion that there are many varieties of potential carrier inefficiencies. Furthermore, their dollar impact on the carrier's costs or revenues can cover a wide range. We must determine that the rate at issue is unreasonably high as a result of the inefficiencies shown before ordering a rate to be reduced on that basis (either prospectively or retroactively). Therefore, we must reject the proposal of Edison Electric Institute that some form of compensation be furnished to any party who discovers an inefficiency. That proposal ignores the possibility that other users of a rail system may also have been harmed by the inefficiency, as well as the possibility that no shippers may have been harmed (if the total costs of these inefficiencies are less than the otherwise unavoidable revenue need shortfall). Moreover, it might serve to increase the carrier's costs (burdening other shippers) without promoting efficiency. Thus, a 'bounty' approach for compensating captive shippers is unworkable.
 
 
 42
 1 I.C.C.2d 520, 541-42, slip op. at 26 (Aug. 8, 1985) (footnotes omitted). Plainly the ICC balanced its statutory obligation to consider evidence of management efficiency in fixing a reasonable rate (49 U.S.C.A. Secs. 10704(a)(2) and 10707a(e)(2)(C) (West Supp.1986)) and its statutory obligation to ensure revenue adequacy (49 U.S.C.A. Secs. 10101a(4), 10701a(b)(3), 10704(a)(2) (West Supp.1986)). The rejection of the "bounty" approach was within the ICC's broad discretion in discharging its statutory mandate to devise a methodology for satisfying these somewhat conflicting congressional objectives.
 
 
 43
 Some shippers object to the stand-alone cost constraint on several grounds.[10] One objection is that the stand-alone cost constraint, as designed, permits grouping of other traffic, and will therefore require the use of a Ramsey pricing formula which the ICC conceded is too complex. The ICC however, while rejecting across-the-board application of the complex Ramsey pricing calculation, did not reject the Ramsey principle of allocating shared costs in relation to demand. The ICC noted:
 
 
 44
 For ease of administration, we think it reasonable and practical to assume that the revenue contribution of other (i.e., non-complaining) shippers will be at the level of their current rates. However, this presumption is rebuttable and, if it can be shown that their rates are not at the Ramsey optimal level, then their revenue contribution to the hypothetical system may be adjusted accordingly.
 
 
 45
 1 I.C.C.2d 520, 544, slip op. at 29 (Aug. 8, 1985). Thus the ICC left for case-by-case resolution the allocation of costs among services on the basis of Ramsey principles, offering shippers the flexibility to rely either on the presumption that current rates for non-captive shippers are at Ramsey levels or to submit more precise evidence. We conclude, therefore, that this ICC action cannot be regarded as inconsistent with the 4 R and Staggers Acts, or as arbitrary, capricious, or an abuse of discretion.
 
 
 46
 Another objection to the stand-alone cost constraint is that in calculating the hypothetical stand-alone cost the ICC applies a nominal cost of capital to a current value investment base. Some shippers contend that this methodology double counts the impact of inflation, thereby unjustifiably inflating stand-alone costs. The objectors urge that the stand-alone cost should instead be calculated using a real cost of capital. Real cost of capital is defined by the objectors and the ICC as the cost of capital, including a risk premium, where future inflation is expected to be zero. Nominal cost of capital is defined as the rate of return investors would expect to earn in anticipation of future inflation. The effect of inflation can be accounted for either by applying a nominal cost of capital or by appreciation in the value of assets included in the rate base. The objectors point out, correctly, that applying a nominal rate of capital to a rate base adjusted from time to time to reflect current value, a ratemaker would double count the effect of inflation. The ICC responds, also correctly, that there is no double counting so long as the rate base is not indexed for inflation after the initial stand-alone valuation is made. 1 I.C.C.2d 520, 545, slip op. at 30 (Aug. 8, 1985). The ICC concedes that real cost of capital should be used if the stand-alone investment base were to be routinely indexed--a course it does not propose to follow.
 
 
 47
 The objectors to the stand-alone cost constraint also object, on grounds that are not entirely clear, that by using a nominal cost of capital and a one time current value asset base the ICC has increased the amount of sunk investment costs included. Sunk investment costs are those that cannot be recouped upon exit from a business. The ICC's stand-alone cost constraint is intended to approximate a contestable market theory. The underlying premise of a contestable market theory is that a firm will operate efficiently where there is a threat of losing some or all of its market to a new entrant. A contestable market is one in which there is free entry and costless exit. 1 I.C.C.2d 520, 528-29, slip op. at 9-11 (Aug. 8, 1985). The railroad industry does not in fact operate in a contestable market because there are significant entry and exit barriers, or sunk costs. By netting out these sunk costs, the advantages an existing carrier has over a hypothetical stand-alone system offering the same service are eliminated, making market dominant rail traffic theoretically contestable. Given this theoretical justification for the stand-alone cost constraint, we are at a loss to understand the thrust of the objection to nominal cost of capital and a one time current value asset base. The investment base of the hypothetical stand-alone carrier is current value at the time the analysis is done, because it assumes the construction of a competing railroad today, not a pre-existing competitor. So long as exit costs are eliminated, as they are, the use of current value appears to be irrelevant to the sunk investment cost issue.
 
 
 48
 Finally, some petitioners contend that the phasing constraint is defective in two respects. First it is urged that the constraint has no effect on existing railroad rates. The short answer to this contention is that it was not intended to constrain existing rates, but rather to operate against rate increases that might have disruptive economic consequences. Next it is urged that the phasing constraint, by requiring specific proof of its need, imposes an undue burden on complaining shippers. Information as to the need for phasing is within the control of the objecting shipper, and allocation of the burden of proof is consistent with 49 U.S.C.A. Sec. 10701a(b)(2)(A) (West Supp.1986).
 
 
 49
 The ICC's Final Guidelines are a product of notice and comment rulemaking. 5 U.S.C. Sec. 553(c) (1982). Since the rulemaking proceeding was within the ICC's statutory jurisdiction, we may set aside the Final Guidelines only if we find them to be arbitrary, capricious, an abuse of discretion, or not in accordance with law, or if they were adopted without observation of procedure required by law. 5 U.S.C. Sec. 706(2)(A), (D) (1982). The choice by the ICC among alternative means for satisfying its statutory mandate under the 4 R and Staggers Acts is exclusively for that agency. Given this deferential scope of judicial review, for the reasons stated above it is quite apparent that we must reject all the shipper objections to the Final Guidelines.
 
 V.
 
 50
 The Final Guidelines are ripe for judicial review. The carrier objections respecting specific future applications of those guidelines are not ripe for judicial review. The ICC decision in Ex Parte No. 347 (Sub-No. 1), Coal Rate Guidelines, Nationwide, dated September 3, 1985 will be affirmed in all respects.
 
 
 51
 BECKER, Circuit Judge, concurring in part and dissenting in part:
 
 
 52
 I join in Part III of the majority's opinion, which concerns the ripeness of the parties' contentions for judicial review. Additionally, I join in the majority's analysis of the merits in Part IV, except for the portion relating to the Commission's Management Efficiency constraint. I disagree with the majority when it upholds the Management Efficiency constraint as the Commission presently formulates it. In my view, circumstances exist in which the Commission's formulation of the Management Efficiency constraint would permit carriers to pass the costs of inefficiencies on to consumers. Because I believe that possibility contradicts the reasoning involved in adopting Constrained Market Pricing as well as the statutory basis for the regulation, I consider the Commission's decision arbitrary, capricious and contrary to law. Hence I dissent on this point.
 
 
 53
 Although I join the majority in upholding the Commission's adoption of Stand Alone Cost modeling within its guidelines, I also write separately to identify the serious problems that I see developing if the Commission does not effectively minimize the costs incurred by shippers in challenging a carrier's rates (either through a Stand Alone Cost model or through any other Constrained Market Pricing constraint) and maximize the discovery available to them when doing so. The shippers argue forcefully that rate challenges will be frustrated by the complexity of the Commission's inhospitable rules and procedures. Because I agree that rules and regulations that produce such futility would violate the shippers' statutory right to challenge rates, I write to note my belief that future courts may have to set aside the rules if the Commission does not resolve these problems.
 
 I.
 
 54
 I dissent from that portion of Part IV of the majority's opinion that ratifies the Commission's flawed formulation of the Management Efficiency constraint. The Commission would only provide relief from the financial burden of being captive to wasteful railroad management if the demonstrated avoidable revenue loss from the inefficiency rises to the level of the railroad's entire revenue need shortfall.[1] I find this construction arbitrary, capricious and contrary to law. I would therefore grant the petitions for review of Certain Coal Shippers and Consumers Power insofar as they question the Management Efficiency constraint, and I would remand the case for further proceedings.
 
 
 55
 The Commission offers three reasons for restricting the Management Efficiency constraint in this way. First, if the inefficiency is less than the revenue shortfall, no user has been harmed. Second, rate reductions for discovering inefficiencies would only increase the carrier's costs, thereby forcing other shippers to bear a higher share of the railroad's unattributed costs through higher prices. Third, because other rail users may have been harmed by the inefficiency, it would be inappropriate to allow a single user to gain a reduction for the management inefficiencies it discovers.
 
 
 56
 The Commission's first reason proceeds from an assumption, voiced previously by Commissioner Andre, that "[t]he loss from inefficient operations (after verification and quantification) should first be applied as an offset to the carrier's total revenue inadequacy shortfall before it is applied to justify revenue reductions.... Revenue reductions should be required only to the extent that the dollar amount of the inefficiency exceeds the revenue inadequacy shortfall." Petition of Louisville and Nashville Railroad Co., 367 I.C.C. 639, 658, 659 (1983) (Comm'r Andre, concurring), aff'd sub nom. Public Service Co. of Indiana v. ICC, 749 F.2d 753 (D.C.Cir.1984). Because captive coal shippers are obligated to pay rates that would allow the railroad adequate revenues if it were operated efficiently, the shippers are not entitled to lower rates simply because the railroad is not managed efficiently.[2] Inefficiencies that do not exceed revenue shortfall do not harm a shipper, the Commission appears to reason, because a rate reduction that accounts for management inefficiencies can be followed with a rate increase, calculated to allow the carrier to attain revenue adequacy, that exceeds the reduction.[3] 3] The implication is that the carrier does not pass on to shippers the cost of management inefficiencies when it has not attained the level of revenue adequacy for efficient management. If the cost of management inefficiencies were passed on to shippers, however, the rate would contravene the Staggers Act. See Arkansas Power & Light Co., Petition to Institute Rulemaking Proceeding--Implementation of Long-Cannon Amendment to the Staggers Rail Act, 365 I.C.C. 983, 990 (1982) ("we fully subscribe to petitioners' argument that differential pricing should not be used to pass a carrier's avoidable revenue loss on to captive shippers").
 
 
 57
 Within the limitations of economic theory, I can imagine circumstances in which the carrier might pass on at least part of its inefficiencies to shippers before it has attained revenues that are adequate under an efficient operation. A necessary step in analyzing this potential problem is one that the Commission did not undertake. It is necessary to ask why a carrier would set its rates at a level that does not provide adequate revenues.[4] One reason a carrier might set a rate that would not make its revenue adequate is the restraint of market forces. Although carriers have monopolies on the freight of their captive shippers, they do not face totally inelastic demand. For example, an increase in the cost of transporting coal might encourage a utility (to which a captive shipper delivers its coal) to shift to oil. Alternatively, higher transportation costs would raise the cost of producing electricity and might thereby encourage the production of less electricity.[5] The price increase would therefore result in the shipment of less coal. The higher price of rail services thus results in diminished demand, and it is this prospect of diminished demand that might encourage a railroad to charge a price less than that which provides a full return on its sunk physical costs, even though the revenue adequacy constraint permits such a higher price.[6]
 
 
 58
 Under these circumstances, the actual price set by a carrier may depend in part on the carrier's variable costs and might well be less than that necessary for revenue adequacy. Inefficiencies that increase variable costs would thus increase the price demanded by the carrier for services, despite the impact that increased price has on demand. In such circumstances, the carrier may pass on part of the cost of inefficiency to captive coal shippers. Unlike consumers of competitive services, captive coal shippers cannot shift to alternative, more efficient carriers: they can only reduce their demand. The cost of inefficiencies would therefore impact on shippers as both an increase in price and a concommitant reduction in demand. Both constitute a harm, the existence of which undercuts the Commission's contention that a carrier's inefficiencies cannot harm shippers unless the revenues lost from management inefficiencies exceeds the carrier's entire revenue shortfall.
 
 
 59
 This harm also violates the statutory requirements of the Staggers Act. Under the circumstances outlined above, the carrier is able to pass the cost of avoidable management inefficiencies on to shippers--precisely what the Commission found contrary to law in Arkansas Power & Light Co., Petition to Institute Rulemaking Proceeding--Implementation of Long-Cannon Amendment to the Staggers Rail Act, 365 I.C.C. 983, 990 (1982). Moreover, the Commission has recognized that "the statute explicitly makes carrier 'efficiency' a factor that must be considered in determining the reasonableness of a challenged rate." Petition of Louisville and Nashville Railroad Co., 367 I.C.C. 639, 645 (1983), aff'd. sub nom. Public Service Co. of Indiana v. ICC, 749 F.2d 753 (D.C.Cir.1984). So long as inefficiencies may harm shippers, the Commission must attempt to redress them; the Commission may not wait for the complete attainment of one Staggers Act goal--here, revenue adequacy--at the total sacrifice of another--management inefficiency. "One statutory factor cannot be ... blindly exalted at the expense of others that are at least co-equal in importance." Public Service Co. of Indiana v. ICC, 749 F.2d 753, 765 (D.C.Cir.1984). As the Commission itself held when it reviewed that case, "the Federal standard for applying the efficiency factors is, and has been since the enactment of those factors, to consider and balance the factors in such a way that railroads can work towards revenue adequacy and efficiency at the same time." Petition of Louisville and Nashville Railroad Co., 367 I.C.C. at 646 (emphasis supplied); see also id. at 645 ("the two considerations must be balanced together ") (emphasis supplied); S.Rep. No. 94-499, 94th Cong., 1st Sess., at 11 (1975) ("The Commission must strive to attempt to achieve a better balance between the goals of protecting shippers and stable competition and the need to provide adequate revenues to the railroads in order that substantial public services are maintained.") (emphasis supplied).
 
 
 60
 As the Commission's own contemporaneous interpretation of the Staggers Act, this construction is entitled to considerable deference. See, e.g., Quern v. Mandley, 436 U.S. 725, 744 n. 19, 98 S.Ct. 2068, 2079 n. 19, 56 L.Ed.2d 658 (1978). Thus, to be consistent with its own view of the statute, the Commission may not refuse to protect shippers from the burden of a carrier's inefficiencies merely because the carrier is not revenue efficient.
 
 
 61
 The Commission's second and third reasons for granting reductions for inefficiencies only if they exceed a revenue shortfall lack the forcefulness, I believe, even of the first reason. The Commission contends that it cannot reduce one shipper's charges by each dollar of inefficiencies identified by that shipper because such a reduction would (1) unfairly shift costs to other shippers and (2) reward one shipper for the identification of inefficiencies that disadvantage many others. The short answer to these justifications is that the Commission has mischaracterized the opposing views.[7] The Commission was not requested to award a "bounty" to the identifying shipper, only to apportion a reduction in rates based on the carrier's inefficiencies to all affected shippers. By reducing the rates of individual shippers only by their share of the harm, as the commentor suggests, the Commission would not shift costs or unfairly burden any shipper. The argument that the discovering railroad should not receive a rate reduction equal to the entire avoidable revenue loss attributable to the discovered management inefficiency--which is certainly correct--in no way supports the Commission's decision to deny the discovering railroad any reduction.
 
 
 62
 The Commission now complains that the commentors "did not offer a methodology to determine the level of the proposed compensation." Ex Parte No. 347 (Sub-No. 1), 1 I.C.C.2d at --- n. 56, slip op. at 26 n. 56. This argument is disingenuous because the Commission itself adopted a method for apportioning unattributed costs among captive coal shippers in Ex Parte No. 347 (Sub-No. 1).[8] In addition, the Commission defends an attack on the Stand Alone Cost constraint on the theory that apportionment may be accomplished either by (1) the direct application of the Ramsey pricing principle of allocation based upon demand elasticity, or (2) the presumption that "the revenue contribution of other (i.e., non-complaining) shippers will be at the level of their current rates." Ex Parte No. 347 (Sub-No. 1), 1 I.C.C.2d at ---, slip op. at 29; see also Maj.Op., supra at 1456. Just as the unattributed costs are presumptively borne in this proportion by all captive coal shippers, so may the reduction in that revenue shortfall represented by the discovery of avoidable revenue loss be apportioned in some way.
 
 
 63
 In sum, none of the three reasons advanced by the Commission to explain the limitation on the Management Efficiency constraint are supportable. We should therefore grant the petitions for review to the extent they challenge the Management Efficiency constraint and remand to the Commission for further findings. Because the Commission adopts Ramsey pricing principles, I believe that we should remand to permit it to develop a method of apportioning the avoidable revenue loss attributed to management inefficiency in a manner consistent with those principles.[9] Moreover, the circumstances under which a carrier, even though revenue-inadequate, would pass on to shippers the costs of management inefficiencies should also be tested by the agency's expertise on remand. In light of its extensive experience with railroad ratemaking, its understanding of railroad economics, and its ability to develop sound facts to support admittedly broad theories, the Commission should directly address this possibility for harm.
 
 II.
 
 64
 Congress enacted the Staggers Act in part to grant captive coal shippers a procedural mechanism whereby they may challenge the rates charged them by rail carriers. I join with the majority when it upholds the general proposition that the Stand Alone Cost constraint of Constrained Market Pricing is a proper exercise of the discretion granted the Commission under the Act. I also agree with the majority when it (implicitly) evinces a tolerance for this well-reasoned form of regulatory experimentation.
 
 
 65
 I write separately on this point to explain the serious problems of practical application that lurk beneath the adoption of the Stand Alone Cost constraints, problems associated with litigation costs and the Commission's prescribed showing for entitlement to discovery. Excessively burdensome litigation expenses and impediments to discovery, both incipient in the Constrained Market Pricing regime, have the potential to defeat the congressional scheme by working to deny captive coal shippers meaningful access to rate review--a state of affairs that would require granting relief to the shipper-petitioners. Because the Commission has it within its power to exacerbate or mitigate both of these problems, and because the practical denial of meaningful rate review because of either would have to be considered arbitrary, capricious and contrary to law, I believe that the Commission and future reviewing courts must be vigilant that the experiment does not go awry.[10]
 
 A.
 
 66
 One of the most significant practical problems with the Stand Alone Cost constraint is the cost to the shipper of challenging a rail rate under the system. As the Chairwoman of the Commission has acknowledged, "the costs of presenting a maximum rate case may be too great for the small shipper." Consumer Rail Equity Act: Hearing on S. 477, Before the Subcommittee on Surface Transportation of the Senate Committee on Commerce, Science and Transportation, 99th Cong., 2nd Sess. (1986) (testimony of Heather Gradison). The reason for this expense should be obvious: the protesting shipper is required to "assume a railroad"--no mean task. As the evidence before the Commission reveals, the calculation of stand-alone costs involves
 
 
 67
 determination of a hypothetical stand-alone railroad and the current reproduction costs of trackage, locomotives, and freight cars. One of the first problems encounteed by the "stand-alone" analyst is how many miles of track and how many locomotives and cars are needed for the "stand-alone" rail network. With traffic which is diverse in nature, involving several railroads and movements over branch lines and main lines, between multiple origins and destinations, computation of stand-alone cost amounts to a rationalization as to which facilities and how much equipment would be needed for the hypothetical operation.
 
 
 68
 Verified Statement of Eugene F. Bilz, at 6 (July 28, 1983). Such a complex, time-comsuming calculation can only be pursued at a high price.
 
 
 69
 Prohibitive costs would impermissibly impede access by small shippers to the rate review that Congress has mandated. It is not apparent from the record before us exactly what the costs involved in an individual Stand Alone Cost model will be, nor can I demonstrate at this juncture and on this record that they will be higher than costs attendant to individual litigation under the present Commission jurisprudence. But common sense tells me that they must be, given the "assume-a-railroad" requirement that I have identified.[11]
 
 
 70
 The Interstate Commerce Act was not passed as a full employment bill for economists; it provides a procedure to shippers for challenging railroad rates. If a shipper was forced to duplicate the development of an expensive Stand Alone Cost model that another shipper had previously developed, the Commission would be employing economists at the expense of the captive shippers it was in part established to protect.[12] Such a result would have to be considered contrary to law. Indeed, the Stand Alone Cost system was adopted as a surrogate, to implement Ramsey pricing without the attendant costs of the exact quantifications of true Ramsey pricing--long-run marginal cost and demand elasticity for every rail movement in the carrier's system. See id. at 9, 15, 16-17. Inflating the already high price of modeling or failing to control it would be contrary to this stated purpose.
 
 
 71
 It is evident that the Commission has cost control within its power. Because the Commission has the power to abuse its discretion by imposing untoward litigation costs through a failure to exercise such control, it must be vigilant to minimize costs as specific applications put flesh upon the guidelines. Failure to do so, in my view, would render the Stand Alone Cost constraint (and perhaps the entire Constrained Market Pricing regime, of which Stand Alone Cost is a critical part) arbitrary, capricious and contrary to law.
 
 B.
 
 72
 I am also concerned that discovery problems may impede access to the system of rate review that Congress has mandated. In this regard, I join three of the four commissioners[13] who wrote separately out of concern that the Commission's discovery procedures might deny access to relevant information. See Ex Parte No. 347 (Sub-No. 1), 1 I.C.C.2d at ---, slip op. at 35 (Chairman Taylor, commenting); id. (Comm'r Simmons, commenting); id. at ---, slip op at 36 (Comm'r Lamboley, concurring). As petitioner Consumers Power describes this concern, the Commission will retard the needed flow of information by imposing "a substantial threshold burden on a shipper seeking to present a case."
 
 
 73
 The Commission's decision states with regard to discovery that "a shipper seeking discovery must state with particularity the nature and substance of the charges it seeks to prove, as well as the basis for its belief in those charges. In other words, it must demonstrate a real, practical need for the information." Id. at 33. I find troublesome the Commission's equation of "a real, practical need for the information" with a petitioner's ability to "state with particularity the nature and substance of the charge it seeks to prove." The very reason that a shipper petitioning for relief would require information--that is, that the data is the type that is wholly in the hands of the railroad or another shipper, see id. at 35 (Comm'r Simmons, commenting)--is the reason it may be unable to specify with particularity the charges it seeks to prove.
 
 
 74
 The Commission's "particularity" concept must be narrowly defined if it is to avoid improperly denying access to congressionally mandated rate review. Because of the vital role played by such information throughout the Constrained Market Pricing system,[14] and to animate the Commission's stated desire that shippers obtain all information that is of practical necessity, the Commission's "particularity" concept should mirror modern principles of notice pleading as opposed to the model presented under Rule 9(b) of the Federal Rules of Civil Procedure. Cf. Note, Pleading Securities Fraud Claims with Particularity Under Rule 9(b), 97 Harv.L.Rev. 1432 (1984). I note, therefore, that the Commission has previously defined its discretion under the Staggers Act in this manner, refining any "particularity" concept implicit in the statute as requiring only that the complaining shipper notify the carrier of the information it is requesting with reasonable specificity.
 
 
 75
 In Arkansas Power & Light Co., Petition to Institute Rulemaking Proceeding--Implementation of Long-Cannon Amendment to the Staggers Rail Act, 365 I.C.C. 983 (1982), the Commission specifically held that
 
 
 76
 complainants usually do not possess specific information about a railroad-respondent's traffic mix and pricing practices. Threfore [sic], we will grant reasonable discovery requests to enable the complainant to obtain from the rail carrier information relevant to the Long-Cannon factors.[15] Id. at 997 (footnote to above-cited ICC discovery rules omitted). This represents a "contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion," Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965) (citations omitted), and is thus entitled to substantial deference. I assume that this facet of the Commission's jurisprudence will control, for the area becomes most problematic if it does not.
 
 
 77
 The problems that Consumers Power anticipates should also be alleviated by our holding that "the shipper has access to data in the exclusive possession of carriers through ICC discovery procedures." Maj.Op., supra at 1454-55. This holding properly imports into Constrained Market Pricing the I.C.C. discovery procedures codified at 49 C.F.R. Secs. 1114.21--1114.31 (1986), which are "applicable to all types of [I.C.C.] proceedings," 49 C.F.R. Sec. 1100.2 (1986), and are to be "construed liberally to secure just, speedy and inexpensive determination of the issues presented." 49 C.F.R. Sec. 1100.3 (1986).[16] These discovery rules were promulgated pursuant to full notice and comment, see 47 Fed.Reg. 49,534 (1984) (final rules); 47 Fed.Reg. 28,115 (1982) (notice of proposed rules), and define the "particularity" concept as one of notice and not an impediment to discovery. See, e.g., 49 C.F.R. Secs. 1114.22(b)(4), 1114.30(b) (1986) (requiring "particularity"); see also 49 C.F.R. Sec. 1104.5(b) (1986) (specifying form of particularity required in pleading).
 
 
 78
 In sum, I presume that these discovery rules will be properly applied, notwithstanding the harbingers of a more restrictive view contrained in the Commission's decision. I therefore join in the court's holding that the threshold discovery requirement of particularity neither contradicts the theories behind Constrained Market Pricing nor offends either the dictates of the governing statute or the guarantees of constitutional due process. Time will tell whether our confidence has been justified.
 
 
 
 *
 Hon. Donald W. Van Artsdalen, United States District Judge for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 The shipper petitioners include Consumers Power Company, Dayton Power & Light Company, Edison Electric Institute, Central Illinois Light Company, Central Louisiana Electric Company, NERCO, Inc., Potomac Electric Power Company, Public Service Company for Indiana, Inc., South Carolina Public Service Authority, System Fuels, Inc., Western Coal Traffic League, Consumer Owned Power Coalition, Eastern Coal Transportation Conference, Alabama Power Company, Georgia Power Company, Gulf Power Company, Mississippi Power Company, Southern Company Services, Inc., Electric Fuels Corporation, Carolina Power & Light Company, Duke Power Company, South Carolina Electric & Gas Company, Tampa Electric Company, Kerr-McGee Coal Corporation, Iowa-Illinois Gas & Electric Company, Iowa Power & Light Company, Iowa Public Service Company, Iowa Southern Utilities Company, Oklahoma Gas & Electric Company, Southwestern Electric Power Company, Omaha Public Power District, Iowa Electric Light & Power Company, Atlantic City Electric Company, Commonwealth Edison Company, Madison Gas & Electric Company, Monongahela Power Company, Pennsylvania Power & Light Company, The Cleveland Electric Illuminating Company, Union Electric Company, Wisconsin Electric Power Company, Wisconsin Power & Light Company, and Wisconsin Public Service Corporation
 The shipper intervenors are Carolina Power & Light Company, Duke Power Company, South Carolina Electric & Gas Company, Tampa Electric Company, Kerr-McGee Coal Corporation, Iowa-Illinois Gas & Electric Company, Iowa Power & Light Company, Iowa Public Service Company, Iowa Southern Utilities Company, Oklahoma Gas & Electric Company, Southwestern Electric Power Company, Omaha Public Power District, Iowa Electric Light & Power Company, Atlantic City Electric Company, Commonwealth Edison Company, Madison Gas & Electric Company, Monongahela Power Company, Pennsylvania Power & Light Company, The Cleveland Electric Illuminating Company, Union Electric Company, Wisconsin Electric Power Company, Wisconsin Power & Light Company, and Wisconsin Public Service Corporation.
 
 
 [2]
 The carrier petitioners include Chessie System Railroads, Consolidated Rail Corporation, Norfolk & Western Railway Company, Seaboard System Railroad, Inc. and Southern Railway System (hereinafter Eastern and Southern Railroads)
 Some carriers, as intervenors, defend the ICC Order, or contend that the shipper petitions are not ripe for review. These include: The Atchison, Topeka & Santa Fe Railway Company, Burlington Northern Railrod Company, Chicago & North Western Transportation Company, The Denver & Rio Grande Western Railroad Company, Elgin, Joliet & Eastern Railway Company, Green Bay & Western Railroad Company, Kansas City Southern Railway Company, Missouri-Kansas-Texas Railroad Company, Missouri Pacific Railroad Company, Soo/Milwaukee System, Southern Pacific Transportation Company, and Union Pacific Railroad Company (hereinafter Western Railroads).
 
 
 [3]
 The shipper petitioners include Consumers Power Company, Dayton Power & Light Company, Edison Electric Institute, Central Illinois Light Company, Central Louisiana Electric Company, NERCO, Inc., Potomac Electric Power Company, Public Service Company for Indiana, Inc., South Carolina Public Service Authority, System Fuels, Inc., Western Coal Traffic League, Consumer Owned Power Coalition, Eastern Coal Transportation Conference, Alabama Power Company, Georgia Power Company, Gulf Power Company, Mississippi Power Company, Southern Company Services, Inc., Electric Fuels Corporation, Carolina Power & Light Company, Duke Power Company, South Carolina Electric & Gas Company, Tampa Electric Company, Kerr-McGee Coal Corporation, Iowa-Illinois Gas & Electric Company, Iowa Power & Light Company, Iowa Public Service Company, Iowa Southern Utilities Company, Oklahoma Gas & Electric Company, Southwestern Electric Power Company, Omaha Public Power District, Iowa Electric Light & Power Company, Atlantic City Electric Company, Commonwealth Edison Company, Madison Gas & Electric Company, Monongahela Power Company, Pennsylvania Power & Light Company, The Cleveland Electric Illuminating Company, Union Electric Company, Wisconsin Electric Power Company, Wisconsin Power & Light Company, and Wisconsin Public Service Corporation
 
 
 [4]
 See Potomac Elec. Power Co. v. I.C.C., 744 F.2d 185 (D.C.Cir.1984)
 
 
 [5]
 See footnote 2, supra, for a complete listing
 
 
 [6]
 Long-run marginal costs consist of all operating and capital costs directly associated with moving a particular traffic, but none of the unattributable costs. 1 I.C.C.2d 520, 538, n. 43, slip op. at 21, n. 43 (Aug. 8, 1985)
 
 
 [7]
 Rail Form A is a statistical-based formula used to demonstrate the extent various rail costs have fluctuated with traffic volume
 
 
 [8]
 The term is a reference to the British economist, mathematician, and philosopher, Frank P. Ramsey who devised the econometric pricing model published in A Contribution to the Theory of Taxation, 37 Econ.J. 47-61 (March 1927)
 
 
 [9]
 The four constraints on carrier charges to captive shippers are outlined in Part II above
 
 
 [10]
 One ground is that it is significantly expensive and burdensome to present a case under this constraint. This burdensome argument is undercut by the fact that several stand-alone cost presentations have already been made to the ICC in individual cases and that the ICC has stated its intention to monitor and modify the guidelines to ensure they are workable
 Additionally, the shippers' contentions that the stand-alone cost constraint is prohibitively expensive and burdensome for most shippers to use and that it is internally inconsistent are further discredited by the recent ICC decision which ruled that the challenged coal rates there exceeded a maximum reasonable level. See Omaha Public Power District v. Burlington Northern R.R., 2 I.C.C.2d 1, slip op. at 1-2 (Nov. 14, 1986). The complaining shipper there successfully presented and proved that the rate exceeded the stand-alone cost. See id. at 12-26, slip op. at 12-26.
 
 
 [1]
 The Commission makes revenue adequacy the touchstone of the Management Efficiency Constraint despite the fact that both the Congress and the Commission itself have raised serious doubts about the estimation of revenue adequacy. As Chairwoman Gradison has testified in Senate hearings, "the Commission is unanimous in its recognition that there are real problems in the estimation of revenue adequacy." Consumer Rail Equity Act: Hearing on S. 477, Before the Subcomm. on Surface Transportation of the Senate Committee on Commerce, Science and Transportation, 99th Cong. 2d Sess. 27 (1986) (testimony of Heather Gradison). Apparently, no railroad currently meets the Commission's test of revenue adequacy. Indeed, in the same hearings, Chairwoman Gradison was taken to task by Senator Long because, despite a finding that it was not revenue adequate, "Norfolk Southern came in here with $1.2 million and a lot of influence to see if they could buy Conrail." Id. at 37
 The Commission has now completed proceedings that revise its previous definition of revenue adequacy. See Standards for Railroad Revenue Adequacy, Ex Parte No. 393 (Sub-No. 1) (December 16, 1986). At least five different petitions for review of these proceedings have been docketed to date. See Nos. 86-3798, -3799 (3d Cir., Dec. 31, 1986); Nos. 86-1734, -1735 (D.C.Cir., Dec. 31, 1986); No. 87-3002 (3d Cir., Jan 6, 1987).
 
 
 [2]
 As formulated by the Commission, the Management Efficiency constraint is therefore an adjunct to a determination of revenue adequacy because the constraint assures only that revenue adequacy is evaluated in the context of an efficient railroad
 
 
 [3]
 This reasoning may be made concrete by an example. A carrier's current rate structure produces a million dollar revenue shortfall, and a shipper complains that the carrier incurs $100,000 of management inefficiencies. The Commission reasons that this complaint should not result in the carrier's rates being reduced to eliminate revenues equal to the revenues lost through the inefficiency. Even if the carrier eliminated the waste, it would still have a $900,000 shortfall. After the rate reduction, the carrier would, therefore, be able to raise rates in order to eliminate the remaining revenue need shortfall because the inefficiency is less than the extra revenues it is entitled to earn to attain revenue adequacy
 
 
 [4]
 This inquiry should be made by the Commission on remand. A full examination of the nature of railroad pricing policies is the province of the expert agency, and I confess some level of discomfort in being placed in the position of having to make the analysis from scratch. However, I cannot pay deference to an expert agency determination that the agency did not make. I can only be cognizant of the fact that, on remand, the Commission would be able to correct my own misconceptions by reference to factual data and expert opinion
 
 
 [5]
 If the increased cost of production is passed on to consumers, consumers may use less electricity, thus prompting less production
 
 
 [6]
 So long as the price exceeds average variable costs, i.e., the yet-to-be incurred costs of providing rail service, the carrier would continue to provide the service, at least until it discovers an alternative use of the sunk investments that would be more profitable
 
 
 [7]
 The Commission's view appears predicated on a mischaracterization of the argument presented in the comment of Edison Electric Institute to which it purports to be responding. The Commission construed Edison's comment as a request for "a 'bounty' approach to compensating captive shippers." Ex Parte No. 347 (Sub-No. 1), 1 I.C.C.2d at ---, slip op. at 26. See also Maj.Op., supra at 1455. In reality, Edison Electric requested only that the Commission:
 [r]educe each carrier's gross revenue shortfall by the amount of revenue that the carrier is losing on all of its non-compensatory traffic and the amount of additional revenue it could be earning on all of its competitive traffic. (These steps are required of the Commission under the Long-Cannon Amendment, 49 U.S.C. Sec. 10707a(e)(2)(B) and (C), and the statutory provision that rail carriers be "honest, economical and efficient").
 Comments of Edison Electric Institute, at 3 (July 28, 1983). Edison Electric continued that shippers would derive the benefit of such a reduction when the Commission
 determines the equitable share of the shortfall that each captive shipper should bear. All captive shippers must share in the shortfall, as contemplated by 49 U.S.C. Sec. 10707a(e)(2)(C)(iii).... [But] a rail carrier must not be permitted to penalize other captive shippers because it has failed to charge appropriate rates on non-regulated traffic. Any revenue shortfall which results from exempt traffic not providing the maximum revenue possible must be borne by the railroads. This, again, is required by the statutory command that carriers be "honest, economical and efficient" and by the requirements of the Long-Cannon amendments.
 Id. at 4. In my view, the Commission's mischaracterization of Edison Electric's proposal as a "bounty" request is pejorative and may even amount to "the arbitrary failure to give proper consideration to the core of the petitioner's claim [that] is an abuse of discretion." Santa-Figueroa v. INS, 644 F.2d 1354, 1357 (9th Cir.1981).
 
 
 [8]
 The whole theory of Constrained Market Pricing is predicated in part upon a finding that "payment for facilities or services which are shared (to its benefit) by other shippers should be apportioned according to the demand elasticities of the various shippers." Ex Parte No. 347 (Sub-No. 1), Coal Rate Guidelines, Nationwide, 1 I.C.C.2d at ---, ---, slip op. at 1, 5 (Aug. 8, 1985)
 
 
 [9]
 As I noted earlier, see supra at 1458, the Commission's current formulation of the Management Efficiency constraint appears to proceed from reasoning enunciated by Commissioner Andre in his concurrence in Petition of Louisville and Nashville Railroad Co., 367 I.C.C. 639, 658 (1983) (Comm'r Andre, concurring), aff'd sub nom. Public Service Co. of Indiana v. ICC, 749 F.2d 753 (D.C.Cir.1984). In adopting Commissioner Andre's reasoning, however, the Commission failed to embrace the first, and in my view most important, step:
 First, the revenue inadequate railroad should be given an opportunity to submit a plan for the elimination of the loss traffic or inefficiency.... In order to satisfy the statutory concern for efficient operations, revenue reductions for profitable traffic may be allowed if the railroad refuses to take feasible and lawful steps to eliminate the inefficiency.
 
 
 [367]
 I.C.C. at 659. Consideration of this vital first step should also be undertaken by the Commission on remand
 
 
 [10]
 I also note that my concerns are not mitigated by the contention that the Stand Alone Cost constraint is merely a back-up to the Management Efficiency constraint. Rather than a back-up, it is a fully independent method of testing a rail rate under the Staggers Act. Moreover, because I view the Management Efficiency constraint as flawed, see supra Part I, I find potential problems with the Stand Alone Cost constraint especially worrisome
 
 
 [11]
 At oral argument, the attorney for Consumers Powers represented that, on the basis of evidence submitted to the Commission as part of its hearings on Ex Parte No. 347 (Sub-No. 2), "stand-along cost studies that have been presented to date have cost up to $1 million or more." Tr. at 74. The fact that large entities have in the past been able to afford such fees does not preclude the possibility of smaller entities in the future being unable to meet the charges without substantial hardship
 
 
 [12]
 For example, if Shipper A challenges a rate with a Stand Alone Cost model, it may present an ideal grouping that captures the relevant economies of scope, scale and density without the disadvantageous burden of excess capacity. If Shippers B and C are a part of that grouping, they may benefit from access to Shipper A's model in presenting any of their own rate challenges. Of course, Shipper A alone should not have to bear the cost of preparing a model from which all three shippers derive substantial benefit. But a system of cost sharing would better alleviate this problem than one that does not facilitate the sharing of information and thereby forces shippers to reinvent the models of other shippers. To this end, to avoid a finding that it has abused its discretion in a particular case, the Commission might consider allowing one shipper discovery from another shipper who had previously developed a relevant Stand Alone Cost model, sharing costs under authority of 49 C.F.R. Sec. 1114.21(c)(3) (1986); see also 49 C.F.R. Sec. 1114.22(a) (1986) (allowing discovery against non-parties). Similarly, too broad an issuance of protective orders under 49 C.F.R. Sec. 1114.21(c) (1986) would impose higher litigation costs and could lead to a finding that the Commission has abused its discretion
 
 
 [13]
 Seven commissioners participated in the decision
 
 
 [14]
 The central role of such information is not confined to the Stand Alone Cost constraint. It pervades all of the constraints involved in Constrained Market Pricing
 
 
 [15]
 The Commission continued:
 In view of the short deadlines for deciding rail cases (49 U.S.C. 10327), complainant must make its discovery request as soon as possible after it files its complaint and must focus its request as narrowly as possible. We will not sanction "fishing expeditions" in which a complainant asks a carrier to reveal cost studies for all its movements. Complainants must identify particular commodities or rates or routes that it believes appropriate for Long-Cannon analysis and so focus their discovery requests.
 Id. at 997.
 
 
 [16]
 49 C.F.R. Sec. 1100.2 requires application of these procedures even without explicit incorporation. Specific incorporation is apparently the practice only where private parties include it in recommended regulations submitted for Commission approval. See, e.g., Ex Parte No. 445 (Sub-No. 1), Intramodal Rail Competition, 1 I.C.C.2d 822 (1985); 50 Fed.Reg. 46,066 (1985), codified at 49 C.F.R. Sec. 1144.6(c) (1986)