# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

Argued March 18, 2024                    Decided July 26, 2024

No. 23-1126

IN RE: WESTERN COAL TRAFFIC LEAGUE,
PETITIONER

---

On Petition for a Writ of Mandamus
to the Surface Transportation Board

---

*Andrew B. Kolesar III* argued the cause for petitioner. On the petition for a writ of mandamus and reply were *William L. Slover* and *John H. LeSeur*.

*Thomas A. Quinn*, Attorney, Surface Transportation Board, argued the cause for respondent. With him on the opposition to the petition for writ of mandamus were *Craig M. Keats*, General Counsel, and *Anika S. Cooper*, Deputy General Counsel.

Before: WILKINS and CHILDS, *Circuit Judges*, and ROGERS, *Senior Circuit Judge*.

Opinion for the court by *Senior Circuit Judge* ROGERS.

ROGERS, *Senior Circuit Judge*: The Surface Transportation Board is to ensure "reasonableness" of freight rail shipping rates, and in so doing address whether a railroad is "revenue adequate." 49 U.S.C. §§ 10701(d)(1), 10704(a)(2)–(3). In April 2014, the Board opened an informational docket to obtain public comment on how the Board calculates and applies this concept in shipping rate cases. Notice, STB Dkt. EP 722, *R.R. Revenue Adequacy* (Apr. 1, 2014) ("*Revenue Adequacy*") at 1. Over the next six years, the Board collected information through written comments and public hearings. During the following two years, the Board received further information by these means on a task force report with policy recommendations. Although the Board has addressed revenue adequacy in other rulemaking dockets and in rate case adjudications, it has not issued a decision in the *Revenue Adequacy* proceeding since receiving comments in February 2020.

Petitioner Western Coal Traffic League, a coalition of coal shippers, submitted comments and participated in the Board's hearings advocating modifications to the Board's framework for calculating and applying the revenue adequacy concept in rate cases. Despairing of what it characterizes as the Board's unreasonable delay in responding to shippers' proposals, the League petitions for a writ of mandamus compelling the Board, within 90 days, to publish either a notice of proposed rulemaking on revenue adequacy or "serve a final decision in [the] *Revenue Adequacy* . . . [docket] explaining why it is discontinuing the proceeding." Pet. at 2–4. Although the court may grant mandamus pursuant to the All Writs Act, 28 U.S.C. § 1651(a), to compel agency action that the court would ultimately have jurisdiction to review, the Board's management of its *Revenue Adequacy* docket is not such agency action. The Hobbs Act, 28 U.S.C. § 2342(5), authorizes judicial review of the Board's "final orders," which

the *Revenue Adequacy* proceeding is not. The Board convened the proceeding solely to gather public comment on certain ratemaking issues, without any statutory duty or stated plans to undertake a rulemaking or specific regulatory action. The court therefore dismisses the League's petition for mandamus for lack of jurisdiction.

## I.

In vesting the Surface Transportation Board with the authority to regulate interstate rail transportation, 49 U.S.C. § 10501, Congress has required the Board to ensure the reasonableness of railroad freight shipping rates for "captive traffic" on routes where a particular railroad has "market dominance." *See id.* §§ 10707, 10701(d)(1). To evaluate the reasonableness of captive traffic rates, the Board applies a three-factor test adopted by the Interstate Commerce Commission. *See CF Indus., Inc. v. Surface Transp. Bd.*, 255 F.3d 816, 827 (D.C. Cir. 2001) (citing *Coal Rate Guidelines, Nationwide*, 1 I.C.C.2d 520, 535 (1985)).

The first factor is whether the railroad is "revenue adequate." Congress directed that "rail carriers shall earn adequate revenues," 49 U.S.C. § 10701(d); *id.* § 10101(3), (6), and that the Board "maintain and revise as necessary" a methodology for assessing which railroads are revenue adequate. *Id.* § 10704(a)(2)–(3). In rate cases, the Board examines a railroad on a "system-wide basis to determine the revenue[] it needs to 'provide a rate of return on net investment equal to the current cost of capital (i.e., the level of return available on alternative investments).'" *CF Indus.,* 255 F.3d at 827 (quoting *Coal Rate Guidelines*, 1 I.C.C.2d at 535). If a "carrier is revenue adequate," the Board considers whether "a complaining shipper may be entitled to rate relief." *W. Tex. Utils. Co. v. Burlington N. R.R.*, 1 S.T.B. 638, 655 (1996).

4

In April 2014, the Board issued a Notice of Proceeding to "explore the Board's methodology for determining railroad revenue adequacy, as well as the revenue adequacy component used in judging the reasonableness of rail freight rates." *Revenue Adequacy* at 1. Explaining that in recent years "questions have been raised regarding the agency's methodology for determining revenue adequacy," the Board "intended [the *Revenue Adequacy* proceeding] as a public forum to discuss" these topics "with a view to what, if any, changes the Board can and should consider." *Id.* at 4. The Notice listed questions on which the Board sought comment. It also discussed a related docket on a rulemaking proposed by the Western Coal Traffic League addressing "how [the Board] determines the railroad industry's cost of equity capital," which is "a component of the methodology that the Board uses to determine revenue adequacy." *Id.* The Board invited comments on both dockets in advance of a public hearing. *Id.* at 5. In July 2015, the Board held a two-day hearing on both dockets, and in August 2015, the Board closed the *Revenue Adequacy* record after accepting reply comments.

The Board thereafter established a rate reform task force ("RRTF") with the "objectives of developing recommendations to reform and streamline the Board's rate review process for large cases, and determining how to best provide a rate review process for smaller cases." Notice (Sept. 12, 2019) at 2. In March 2018, the Board announced that in order to obtain "stakeholder input" relevant to the RRTF's work, it would permit "informal discussions [with] . . . stakeholders related" to *Revenue Adequacy.* Decision (Mar. 28, 2018) at 1. It also advised that "no rulemaking has been initiated" and it "has not determined the next action it will take relating to this proceeding," describing *Revenue Adequacy* as a "pre-rule informational and hearing docket." *Id.*

The RRTF Report of April 25, 2019, was posted on the Board's website for comment. The RRTF's recommendations included rulemakings on (1) the Board's revenue adequacy methodology, focusing it on providing a long-term rather than snapshot picture of a railroad's financial performance, and (2) shipper rate remedies where a railroad is revenue adequate, moving away from a fixed rate cap and towards a flexible metric aimed at carrier revenue surplus. RRTF Report (Apr. 25, 2019) at 33, 35–41. In September 2019, the Board announced another public hearing, inviting public comment and noting four recommendations in the RRTF Report. Notice (Sept. 12, 2019) at 2–3. Reply comments were due in February 2020.

The League filed comments with the Board in 2014 and 2019 and participated in both sets of public hearings. The League advocated changes to the Board's revenue adequacy methodology and its application in rate cases to better reflect recent growth in stable profitability for the primary national railroads. In particular, the League urged the Board to change how it calculates the necessary return on investment for a railroad to be revenue adequate and to abandon its longstanding focus on "cost of capital." League Statement (Sept. 5, 2014) at 10–11, 20–21. It urged as well that any rate increases by revenue adequate railroads under its new proposed methodology should be subject to a presumption of unreasonableness in rate cases. *Id.* at 30–33. Commenting on the RRTF Report, the League advocated the same proposals, stating its approach was simpler and in greater harmony with the statutory framework than the RRTF's recommendations. League Statement (Nov. 26, 2019) at 18–19. In August 2022, the League filed a "petition for administrative action" by the Board to advance the proceedings to the rulemaking stage.

In May 2023, the League filed a petition for a writ of mandamus compelling the Board to publish a notice of proposed rulemaking within 90 days of issuance of the writ, and to take final action in the *Revenue Adequacy* proceeding within one year, or to serve a final decision on issuance of the writ explaining why it is discontinuing the proceeding. Pet. at 4. Relying on the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ("APA"), the League argues that mandamus is warranted because the Board's "inaction" in "addressing the merits" of shipper comments on the *Revenue Adequacy* docket is "clearly unreasonable." Pet. at 2 (citing *Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 76 (D.C. Cir. 1984) ("*TRAC*")), 16 n.9, 21. In the League's view, if "the Board intends to deny these requests," the APA obligates the Board to provide "'prompt notice' of its denial in a judicially reviewable final decision explaining its actions." *Id.* at 18–19 (discussing 5 U.S.C. § 555(b), (e)).

## II.

Mandamus is an "extraordinary remedy," reserved "only for the most transparent violations of a clear duty to act." *In re Bluewater Network*, 234 F.3d 1305, 1315 (D.C. Cir. 2000). When a party requests mandamus against a federal agency under the All Writs Act, 28 U.S.C. § 1651(a), *see* Pet. at 2, the court undertakes a three-step inquiry. *In re Nat'l Nurses United*, 47 F.4th 746, 752 (D.C. Cir. 2022). First, the court must ensure its own jurisdiction by "considering whether issuing the writ would protect . . . current or prospective jurisdiction." *Id.* Second, if it has jurisdiction, the court asks "whether the agency has a crystal-clear legal duty to act." *Id.* Third, even if an agency has breached a clear duty to act, the court will consider "whether judicial intervention would be appropriate" as mandamus is a "drastic remedy reserved for extraordinary circumstances." *Id.* 752–53 (citing, *inter alia*,

*Cheney v. U.S. Dist. Ct.*, 542 U.S. 367, 380 (2004)). This court's inquiry ends at the first step because the court has no current or prospective jurisdiction that the writ sought by the League would aid or protect. *See Moms Against Mercury v. FDA*, 483 F.3d 824, 827–28 (D.C. Cir. 2007).

The All Writs Act "does not grant jurisdiction" to the court and "authorizes the issuance of a writ of mandamus in aid of jurisdiction [the] court already has or will have as a result of issuing the writ." *In re Nat'l Nurses*, 47 F.4th at 752 (citing *In re Tennant*, 359 F.3d 523, 527–28 (D.C. Cir. 2004)). The court can issue a writ of mandamus to compel agency action unreasonably delayed, as sought here, where the court's power stems from its "interest in protecting its future jurisdiction." *Moms Against Mercury*, 483 F.3d at 827 (citing *TRAC*, 750 F.2d at 75). That interest does not "arise if the final agency action" to be compelled is not ultimately reviewable by the court. *Id.*

The Hobbs Act authorizes the court to review the Board's "rules, regulations, or final orders." 28 U.S.C. § 2342(5). Agency action is "final" when it (1) is not "tentative," marking "the consummation of the agency's decisionmaking process," and (2) either determines "rights or obligations" or brings about "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal citations and quotations omitted). The Board "inaction" about which the League complains neither represents a non-tentative conclusion nor brings about legal consequences.

The League interprets the *Revenue Adequacy* proceeding as intended to produce a rulemaking or other agency conclusion about reforms to the revenue adequacy constraint. It views the Board's lack of further comment on the docket as an implicit "final" decision on the proposals made by

commenters. Pet. Reply Br. at 4. Similarly, the League views the Board's failure to respond to shipper comments as tantamount to a final Board decision "not to institute [rulemaking] proceedings." *Id.* Neither view has record support. The League points to no statement by the Board that it intended to use the *Revenue Adequacy* proceeding as a vehicle to take final action "bind[ing] either itself or regulated parties," *Kennecott Utah Copper Corp. v. U.S. Dep't of Interior*, 88 F.3d 1191, 1223 (D.C. Cir. 1996).

In establishing the *Revenue Adequacy* docket, the Board described its purpose was to collect public input, convening a "public forum to discuss" and "explore" revenue adequacy topics "with a view to what, if any, changes the Board can and should consider." *Revenue Adequacy* at 4. The 2014 Notice contemplated a possibility of future action by the Board in a separate proceeding but made no commitment. Instead the Board repeatedly stated that it was seeking input on a range of issues related to revenue adequacy — a multi-faceted issue of both analytical methodology and ratemaking policy discretion. The March 2018 Decision confirmed that the *Revenue Adequacy* proceeding was a "pre-rule informational and hearing docket," noting as well that "no rulemaking has been initiated" and that the Board "has not determined the next action it will take relating to this proceeding." Decision (Mar. 28, 2018) at 1. The Board continued throughout this period to address related matters in other proceedings, like the rulemaking docket discussed in the April 2014 Notice.

The remaining record confirms this understanding of the purpose of the *Revenue Adequacy* proceeding. The Board did not file a notice or advance notice of proposed rulemaking to modify its basic revenue adequacy framework, as the League suggests, Pet. Reply Br. at 3–7, 9. The Board instead addressed related issues in separate rulemakings and rate-making

adjudication proceedings, including rulemaking dockets and rate case adjudications.[1]

The League's argument by analogy to *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027 (D.C. Cir.), *modified on reh'g*, 293 F.3d 537 (D.C. Cir. 2002), is flawed. The League interprets the closing of the *Revenue Adequacy* docket to new comments without a rulemaking or closure decision as a final Board decision to retain its current revenue adequacy framework. Pet. Reply Br. at 4–6. But in *Fox Television*, the court concluded the decision to retain a slate of broadcast ownership rules was final agency action because Congress had required biennial review of its rules, publication of its "determination" about whether they remained "necessary in the public interest," 280 F.3d at 1033–34, 1037 (internal citations omitted), and to undertake a rulemaking to modify or repeal a rule found to be no longer necessary, *id.* at 1033–34. The court reasoned that the agency's determination certain rules remained necessary was tantamount to a reviewable "decision not to initiate a rulemaking" that it would have been statutorily required to undertake had it reached a contrary conclusion about the rules' continued necessity. *Id.* at 1038.

Congress created a different regulatory framework for railroads and shippers. *See* Part I*, supra*. Indeed, the Board considers itself "free to forgo rulemaking in favor of 'the case-by-case evolution of statutory standards' via 'individual, ad hoc litigation' in rate cases under the revenue adequacy

---

[1] *See, e.g.*, *Joint Pet. for Rulemaking to Establish a Voluntary Arb. Program for Small Rate Disps.*, EP 765 (STB served Dec. 19, 2022); *Final Offer Rate Rev.*, EP 755 (STB served Dec. 19, 2022); *Omaha Pub. Power Dist. v. Union Pac. R.R.*, NOR 42173 (STB served Oct. 3, 2022); *Mkt. Dominance Streamlined Approach*, EP 756 (STB served Aug. 3, 2020); *Revisions to the Cost-of-Capital Composite R.R. Criteria*, EP 664 (STB served Oct. 25, 2017).

constraint." Bd. Br. 25 (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947)). The League identifies no support for a contrary interpretation that would mandate the Board forthwith to commence a rulemaking or close the *Revenue Adequacy* proceeding. Absent such obligation, the Board's decision whether to proceed by rulemaking is the type of discretionary decision where reliance on the APA is generally misplaced.

To the extent the League relies on *TRAC*, 750 F.2d 70, to "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1), the court has jurisdiction to review such a section 706(1) claim "only where a [petitioner] asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphasis in original). As described, the League has not demonstrated that the Board is required to take any specific action with respect to the *Revenue Adequacy* docket. Accordingly, the *TRAC* claim fails.

After all, the League has the option, which it does not deny, *cf.* Pet. Reply Br. at 16–17, to file a petition for a rulemaking by the Board to reform the *Revenue Adequacy* framework. Board regulations provide that any interested party may file a petition for rulemaking and the Board must respond within 120 days. *See* 49 C.F.R. § 1110.2. The League is not a stranger to filing rulemaking petitions with the Board. *See, e.g.*, *Pet. of W. Coal Traffic League for Rulemaking to Abolish Use of the Multi-Stage DCF Model in Determining R.R. Indus.'s Cost of Equity Capital*, EP 664 (Sub-No. 2) (STB served Dec. 20, 2013) (cited in the 2014 Notice on *Revenue Adequacy* at 4 n.6). Absent an explanation why this remedy is unavailable, mandamus is reserved for the rare case where a party has no other available remedy to obtain the relief sought. *In re Tennant*, 359 F.3d at 529–30; *see Cheney*, 542 U.S. at 380–81.

Accordingly, the court dismisses the petition for mandamus for lack of jurisdiction.